SAMMY (LEMME) HARTHMAN, SR., Plaintiff

v.

VERNON E. HARTHMAN, AMIOT W. HARTHMAN and ETHLYN LINDQVIST HALL, being all of the owners of Estate Peter Farm, St. John, together with plaintiff, Defendants

Civil No. 414-1970

District Court of the Virgin Islands

Div. of St. Thomas and St. John

August 21, 1975

Bornn, McLaughlin & Finucan (Thomas W. Finucan, of counsel), St. Thomas, V.I., *for Sammy (Lemme) Harthman*

Bailey, Wood & Rosenberg (W. W. Bailey, of counsel), St. Thomas, V.I., *for Vernon E. Harthman*

Pallme, Anduze & Mitchell (William A. Pallme, of counsel), St. Thomas, V.I., *for Amiot W. Harthman*

Grunert, Stout, Hymes & Mayer (John R. Mayer, of counsel), St. Thomas, V.I., *for Ethlyn Lindqvist Hall*

YOUNG, *District Judge*

MEMORANDUM OPINION AND PARTITION DECREE

### *Acknowledgments*

Most Virgin Islands partition actions, such as this one, involving heirs and land on the island of St. John, demand "the wisdom of Solomon and the patience of Job". As for the exercise of patience in this case, the attorneys and their clients, the commissioners and even the judge, with his court reporter and law clerk, endured as Job's disciples. But query whether the commissioners' land splits and the judge's allocation thereof among the heirs can be said to approach Solomon's wisdom. Be that as it may, grateful acknowledgments are hereby made to the above named attorneys for their valuable help, to the Court Reporter and my law clerk, Thomas Roth, and most importantly to Commissioners Nathaniel O. Wells, C.E., John R. Garfield, A.I.A., and Kenneth Alexander, Realtor, for the dexterity as a group and for their skills which each contributed to the partitioning plan.

## Historical Background

This litigation has a genesis that goes back to 1926 when the late Judge George Washington Williams of this court entered simultaneous adjudications in the estate of Eleanora Louise Harthman (No. 2-1923) and the estate of her subsequently deceased husband, Edgar Thomas Alfred Harthman (No. 6-1925). Eleanora died intestate in 1922, owning Estate Peter Farm, of Peter Bay, St. John. This land was given to her in 1903 by her mother. Eleanora's estate was still being administered by Edgar when he died in 1925. Hence, the two estates were adjudicated in 1926 at the same time. Eleanora's estate was adjudicated as follows:

. . . the assets for distribution are—cash $34.00—nine pieces of personal effects . . . appraised at $27.50 and 51¾ acres of land in St. Jan. [sic]—same being known as Estate 'Peter's Bay', Mahobay Quarter, St. Jan., which was appraised at $450.00 . . . . One half part of the entire estate is declared to belong to the estate of the subsequently deceased husband Edgar Thomas Harthman by right of community . . . the remaining one-half . . . to the children . . . namely ⅛ part of the ½ to each.

In adjudicating Edgar's estate, each of the eight children received a 1/8th interest of Edgar's one-half of the community property. Thus, the whole of Peter Farm became owned by eight children as tenants in common, each an undivided 1/8th share. The eight Harthman children (referred to herein by their given names) are Sammy, Vernon and Amiot (parties to this litigation), Ivan and Oscar (now deceased and whose shares survived to the remaining six children), Lillian and Vivian (whose shares were acquired by Sammy), and Emily Louise (now deceased and whose share was inherited solely by Ethlyn Lindquist Hall—party to this litigation). As a result of these various deaths and acquisitions, Sammy now owns 3/6ths, Vernon, 1/6th, Amiot, 1/6, and Ethlyn 1/6th.

## Procedural Background

This action was initiated by Lillian (Lillian Harthman Cheng) in November, 1970. Not much was done in court for the next three years except for the filing of appearances, answers, motions to dismiss and motions for extensions of time within which the parties believed they could amicably settle upon their respective shares. In a certain filing of November 20, 1973, both Amiot and Vernon indicated that an out-of-court settlement could be reached. The other parties were less hopeful and expressed anxiety to proceed in court. All parties were adamantly opposed to a judicial sale as an alternative to a physical partitioning. After Sammy acquired Lillian's share, he succeeded to her interests as the plaintiff and the caption of this case was accordingly changed.

After granting several extensions for possible out-of-court settlement purposes, by Order of January 24, 1974, I appointed the three commissioners to divide the property into a number of equal parcels (in value) and directed that the parcels may exceed in numbers the number of claimants. It was also ordered that the claimants would have 30 days after the filing of the Commissioners' Report to agree among themselves as to the division of the parcels; failing agreement, I indicated that the Court would divide and allocate by lot. However, now that I have been educated by the Commissioners' Report, the "topo" and perimeter survey drawings and the testimony and arguments at the hearing on the Commissioners' Report and in subsequent filings, I think it best to resort to reason and not to lot in making the allocation of the groups of parcels suggested by the commissioners.

There was resistance to that Order of January 24, 1974, but it came only from Amiot. His principal objections were to the prospective costs, especially the costs for a new perimeter survey and a topographical survey. After 50

years since their inheritance and about five years in court, I think the heirs do need the help of the court, especially that of the commissioners who, in turn, were aided by the recent and expensive but reliable and necessary perimeter and topographical survey drawings.

## The Land Being Partitioned

The land is legally described as Peter Farm of Estate Peter Bay, 2 aa Maho Bay Quarter, St. John, U.S. Virgin Islands, consisting of 26.07± U.S. acres, south and 23.7± U.S. acres north of the public road, and an area of 1.05 acres for the road itself— a total of 50.82 acres.

The property is located on the north coast of St. John between Trunk Bay and Cinnamon Bay. Access is by the North Shore Road, approximately three miles from Cruz Bay Town. The terrain and characteristics of the property form three different general areas:

*Area A:* Sand beach front; partially defined berm; flat terrain with small pond to the rear (south). The water-front continues north and then west around a point but then becomes a moderately steep, rocky coast with a small gravel beach fronted by a coral reef. This gravel beach is impermanent, coming and going in various cycles.

*Area B:* Hillside terrain between the public road and Area A; moderate slopes; fairly easy to create access.

*Area C:* Steep hillside terrain south of the public road; slopes vary from 40% to 60%; difficult access and foundation conditions; partially defined swale.

The commissioners discussed and sketched at some length an approach to partitioning involving subdividing each of the three general areas into six portions of equal value, but this approach was rejected. They encountered problems of access road configuration to the beach, Area A, which made it impossible to equalize parcel areas. They

147

found it necessary to compensate for differing values in Area A by matching individual parcels with more or less valuable parcels in the other two areas.

In Area C, the commissioners found only one feasible route for an access road to serve as much area as possible of this parcel and still maintain Planning Board criteria for subdivision roads. They found it impossible to subdivide Area C into equal areas. After putting logical areas together, in jig-saw fashion, the commissioners arrived at six (6) groups of parcels and I quote from their comments:

*Group 1:* 1B has only fifty linear feet of actual sand beach but this is compensated for by continuity with 1A and the remainder of the waterfront. 1A and 1B were then grouped with a smaller hillside parcel 1C.

*Group 2:* The beach area for 2A is reduced by the pond area but is compensated for by continuity with the large accessible hillside 2B and then grouped with a smaller hillside parcel 2C.

*Group 3:* Same as Group 2.

*Group 4:* The large beach property 4A is coupled with a small 4B area (partly contiguous) and a small hillside lot 4C.

*Group 5:* The large beach property 5A is coupled with the smallest B parcel (5B—partly contiguous) and the large but difficult 5C hillside parcel.

*Group 6:* Beach parcel 6A is protected on the east by National Park property. It is coupled with the largest hillside parcel 6B but which is also difficult to develop.

In order to preserve access to the beach and beach properties, the commissioners recommended that perpetual easements be established for a pedestrial pathway between 3A and 4A from the public road to the water and a fifty-foot (50') wide beach easement adjacent to and along the water's edge.

Having established the six groups of parcels by using their own ingenious "weight-values" system, the commissioners made this following recommendation:

It is intended that each group stand alone and examination of the subdivision plan and weighted point system will establish the reasoning for the groups. The Commissioners recognize that it may well be impossible to satisfy all the parties concerned. We feel, however, that if the owners and their attorneys will give thoughtful, emotion free consideration to this solution, they will find that the six (6) groups are truly approximately equal in value and that each group has desireable [sic] elements of continuity and possibilities for development.

## The Six Groups of Peter Bay, Weighted

| Parcel | Area | Weight | Total |
|--------|------|--------|-------|
| 1A | 2.5 | 12 | 30.0 |
| 1B | 1.5 | 13 | 19.5 |
| 1C | 3.3 | 4 | 13.2 |
| | 7.3 | | 62.7 |
| 2A | 1.1 | 14 | 15.4 |
| 2B | 3.4 | 10 | 34.0 |
| 2C | 4.0 | 3.5 | 14.0 |
| | 8.5 | | 63.4 |
| 3A | 1.2 | 16 | 19.2 |
| 3B | 4.2 | 7 | 29.4 |
| 3C | 3.3 | 5 | 16.5 |
| | 8.7 | | 65.1 |
| 4A | 2.0 | 18 | 36.0 |
| 4B | 2.1 | 6 | 12.6 |
| 4C | 2.9 | 5 | 14.5 |
| | 7.0 | | 63.1 |
| 5A | 2.0 | 17 | 34.0 |
| 5B | 1.1 | 6 | 6.6 |

| ▬ | ▬ | ▬ | ▬ |
|---|---|---|---|
| 5C | 5.6 | 4 | 22.4 |
|  | 8.7 |  | 63.0 |
| 6A | 1.6 | 16 | 25.6 |
| 6B | 7.0 | 5.5 | 38.5 |
|  | 8.6 |  | 64.1 |

## The Allocation of Parcels

The four parties involved in this partition action have made known to the Court their respective first and second preferences, to wit:

|  | First Preference | | Second Preference |
|---|---|---|---|
| Sammy | Parcel Groups 1, 2, & 3 | or | 4, 5 and 6 |
| Vernon | Parcel Groups 3 | or | 4 |
| Amiot | Parcel Groups 1 | or | 4 |
| Ethlyn | Parcel Groups 6 | or | 3 |

▮ From the face of these selections, it is clear that no permutation can be made whereby all parties will receive either their first or second preferences. Sammy argues that he should be granted three contiguous parcels so that his share will be all one piece and not scattered. It matters not to him whether it be the combination of the numbers 1, 2 and 3 groups of parcels or the numbers 4, 5 and 6 Groups of Parcels. In studying the survey drawing, it appears to me, almost without argument, that the numbers 1, 2 and 3 parcel groups should be combined together. The coastline in this northwesterly quarter of Peter Farm virtually cries out for this combination. The coastline of Parcel 1B is practically all rock and cliff. The adjacent Parcel 2A has a sand shore but open to a salt pond. Only by combining 3A of the No. 3 groups with the Nos. 1 and 2 groups will this large segment of Peter Farm share appropriately in the

beautiful beach area of the bay. Furthermore, it would go against my better judgment in land development to grant Sammy three noncontiguous groups of parcels having the shoreline broken by an interloping parcel.

Thus, by allocating to Sammy Parcel Groups 1, 2 and 3, Ethlyn is in the position of being granted her first choice, being the No. 6 Group of Parcels. This now leaves Amiot and Vernon with the number 4 and 5 Groups of Parcels although both opted for the No. 4 group. Rather than toss a coin, or otherwise select by lot, I reviewed their correspondence to me to see if other considerations would yield a solution. Amiot, in his letter of July 18, 1975, expressed a strong objection to Group 4 as having "no protection from the National Park, being smaller and that it was flatter than the other parcels." He also suggested a switch of Parcels 4C with 3C to remedy the situation. He made no objections to the Parcel 5 Group. Vernon, on the other hand, in his letter of July 10, 1975, made a mild objection to the access right-of-way from the public road to the beach situated between Parcel 3A and 4A. He also made no objection to the No. 5 Group of Parcels.

Balancing the objections to the No. 4 Group of Parcels made by each of the heirs, I am inclined to conclude that Vernon has less objection and therefore No. 4 should be allocated to him. However, after examining the "topo" drawing, I believe I discovered why no one selected the No. 5 Group of Parcels. It was interesting to me to note that both Amiot and Vernon selected 4 over 5, even though they each expressed some objection to 4. This is probably where the "judge's hand" should come in—to equalize the distributive shares where there is obvious some need for an adjustment. I believe it can be done as between the No. 4 and No. 5 Group Parcels without any owelty of partition.

I am going to direct the commissioners to reduce the area of Parcel 4B (2.1± acres) and to increase the area of

Parcel 5B (1.1± acres) by moving the boundary line between them westward to a position where the north end is directly below (or south) of the line between 4A and 5B and the south end is directly above (or north) of the line between 4C and 5C. This permutation will accomplish several good results to the No. 5 Group of Parcels, (1) delete the acute angle at the southwest corner of the Parcel 5B triangle, (2) give Parcel 5B a little more area to compensate for the acute angle at the northeast corner of the triangle, (3) will serve generally to make the No. 5 Group of Parcels equally as attractive with the No. 4 Group, and (4) it will avoid having to resort to an owelty in order to equate the shares between Amiot and Vernon.

At the hearing held in July, 1975, on objections, if any, to the Commissioners' Report, all parties to this action were present except for Amiot, but he was represented by his wife who was present. The only objections to the Report were those already discussed above and an additional objection made by Mrs. Amiot Harthman as to the accuracy of the survey drawing made by Virgin Islands Engineering and Surveying, Inc. I received into evidence hearsay material consisting of a computer printout made by a certain Harold J. Selden, an engineer and land surveyor of 60 Broad Street, Red Bank, New Jersey, which indicated an alleged small error in the computation of the total area of Peter Farm. I received this material over the objection of the attorney for Sammy only because I felt that it would be worthwhile to have Mr. Nathaniel Wells check it over and to do his own computer printout. This he did do and has reported to me, showing some of the errors of the Selden computation and also an error of the computation made by the Virgin Islands Engineering and Surveying, Inc. He presented his own computer printout and I am satisfied that the correct acreage of Peter Farm, which includes the areas north and south of the public road

and the road itself, to be 50.82 U.S. acres. The Survey Drawing has been revised as of July 23, 1975, to reflect this accepted acreage.

Mrs. Amiot Harthman also objected to the bearing of the boundary line between Parcel 6A and the adjacent land owned by the National Park Service. She argued that from ancient markers and survey drawings, that line should bear eastwardly from point "D" to point "C" rather than its slightly westerly bearing to point "B" as shown on Survey Drawing 1037-1.

Mr. Nathaniel Wells explained why the correct bearing is between points "D" and "B" and I am satisfied that his explanation is correct. Mrs. Harthman then stated that she knew of an agreement with the National Park Service whereby the Park Service has accepted the boundary line to be between Points "D" and "C". She promised to have this agreement or consent of the Park Service to me within three weeks, but it has not been presented. Furthermore, it was the consensus of all the other parties, as well as being my conclusion, that the small area that would be added to Parcel 6A by the line being moved to run between points "D" and "C" would be too insignificant to disturb the entire partitioning plan and that if the National Park Service were ever to concede that the boundary line is between points "D" and "C", then the small triangular strip of land area created thereby would become a bonus to whomever is granted the No. 6 Group of Parcels.

### Roadways, Costs and Easements

The allocation among co-tenants of their respectively defined portions of the jointly owned land is only part of the partitioning task. Were the Court to end its efforts here, the parties would continue to be in an equally inextricable quandry. The commissioners have superimposed upon the topographical survey drawing the location

153

of an existing dirt road north of the public road and a proposed subdivision road to the south of the public road. They have also indicated a pedestrial right-of-way path from the public road to the beach, to be situated between Parcels 3A and 4A, and, lastly, they have indicated a strip of beach from the water's edge to a point 50′ inland (approximately to the berm) for a mutual easement of the use and enjoyment of the beach. The proposed roadway system and beach easements give rise to the following list of questions:

1. Are the proposed roads located in the best position for land development and servicing all areas?
2. Will the roads be merely right-of-way easements or should they be separate "road plots"?
3. If road plots, who should own and maintain them?
4. What construction of road surface should be done and how should the costs be apportioned?
5. Shall the roads be paved or black-topped; if so, by whom, when and at whose expense?
6. Should there be a community right-of-way access to the beach? If so, should it be a footpath or automobile lane?
7. Should all the present and future landowners of Peter Farm have easements to the entire beach and water front?
8. Should there be restrictive covenants for a sound land development of the entire Peter Farm, now owned by several individual owners?

The parties have anticipated these questions, and perhaps even more and, through their attorneys, have asked the Court to resolve the problems here and now—in the Partitioning Decree. I agree that it should be done and I accept the challenge that it poses. In giving this matter the thought that it requires, I am also mindful of the tax picture which faces each of the owners. Their cost basis is

approximately $10.00 per acre, except that Sammy may have an increased cost basis for his acquisitions from Lillian and Vivian and Ethlyn would have a different cost basis by reason of her inheritance on her mother's death. There may also be some adjustment of the cost basis for the acquisitions from the deceased brothers, Ivan and Oscar. This comes to my mind in considering whether these heirs would be doing the land development, if any at all, or whether they would pass on future sales and development to their own respective heirs who would have a more current cost basis. Be that as it may, some of the problems could be handled in the same way, no matter who does the developing or when it shall be done. I will try to answer the above mentioned questions in seriatum:

1. The proposed roadways are located in the best locations. There are a few tight curves, but they are dictated by the topography. The grades are acceptable and the roadways service all parcels.

2. & 3. The roadways should be road plots—owned by all the parties hereto with provisions to be assigned to a future landowners association or to the government.

4. Initially the roads should be roughed in; i.e., with dozers, graders and with essential culverts and the costs should be borne by the parties hereto in accordance with their respective proportional interests (i.e., $1/2$—$1/6$th, $1/6$th and $1/6$th).

5. Surfacing should come later when and if subdivisions are made and landowners become more numerous with the need for paved roads to service housing. In my decree I shall provide for the costs of this phase of the road construction.

6. There definitely should be a right-of-way to the beach and I believe it should be a 10' wide footpath, but there must be provision for car parking off the

155

public road at the entrance to the footpath. This footpath should also be a separate plot, owned by the parties hereto with provisions for assigning same to a landowners' association.

7. Although the Commissioners have divided the beach area into six (6) parcels, that area, in accordance with the policies spelled out in the Virgin Islands Open Shorelines Act, 12 V.I.C. § 401 et seq., should remain open to all the owners equally. No obstruction or barrier shall be constructed across or within the "shorelines" of said property, as that term is defined in Section 402(b) of the Act, and each plot shall include a mutual easement of the entire area encompassed by the shoreline. Not only does the foregoing conform to the public policy of the uninterrupted and unobstructed use of the Virgin Islands shorelines (see 12 V.I.C. § 401), it further guarantees that the owners will maximize the limited usable beach-front footage (about 600 feet in length) for an area of more than 50 acres.

8. There should be a minimum of restrictive covenants placed upon any portion of the properties at this time. At any rate, the Court should impose a restriction only where the Court believes it to be to the best interest of all the parties hereto.

PARTITIONING DECREE

In accordance with the findings contained in the foregoing Memorandum and for the reasons stated therein, it is hereby

ADJUDGED and DECREED:

1. The subdivision of proposed parcels made by the commissioners in their Report of February 14, 1975, which subdivision plan was superimposed upon the Virgin Islands Engineering and Surveying, Inc., Topographical

Survey Drawing No. 1037-2 dated November, 1974, is hereby accepted and approved with five exceptions, to wit:

(a) The boundary line between Parcels 4B and 5B should be relocated westerly to make a continuous line with the boundary line between Parcels 4A and 5A and Parcels 4C and 5C.

(b) "R.O.W. to Beach" indicated between Parcels 3A and 4A should be drawn as a plot 10′ in width from the public road to the watermark.

(c) There should be a small parking lot area carved out of Parcel 3B adjacent to and along the west side of the proposed subdivision road and opposite the entrance to the footpath R.O.W. to the beach. It should be large enough to accommodate six cars—perhaps an area of 10′ x 30′ and shall be part of the road plot.

(d) There should be shown a beach easement from the water's edge to the berm line—approximately 50′ inland on Parcels 2A, 3A, 4A, 5A and 6A. The line on Parcel 1B should be closer to the rocky shore.

(e) The subdivision roads should be surveyed as separate road plots. There should also be a cul-de-sac at the southernmost end.

2. Virgin Islands Engineering and Survey, Inc., should complete the survey so that a drawing may be recorded and its costs for this additional work shall be shared by the parties to this litigation in accordance with their proportionate shares. The following allocation of said parcels according to the Commissioners' Report as revised by exceptions (a) through (e) of the foregoing paragraph, shall be:

(a) Sammy Harthman   Parcel Groups Nos. 1, 2 and 3

(b) Vernon Harthman   Parcel 4

(c) Amiot Harthman   Parcel 5

   (d)  Ethlyn Lindqvist Hall    Parcel 6

   (e)  All owners in equal    Road plots and beach
        shares, with easements    pedestrial access plot
        of use and equipment
        reserved to all parcels
        in Peter Farm.

3. The expenses of bulldozing, grading and culverting the proposed subdivision roads will be shared and borne by the owners in accordance with their proportionate land ownership, i.e., Sammy, $\frac{1}{2}$; the others each a $\frac{1}{6}$th. This phase of the road construction shall be commenced at such time that there shall be at least a $\frac{2}{3}$rds vote favoring such action among the four present landowners. (Sammy has three votes, the others each have one vote.)

4. *Beach Easement.* All owners of parcels and all future owners of plots which may or shall be subdivided from the parcels located in Estate Peter Farm, of Peter Bay, St. John, shall have a perpetual easement of the use and enjoyment of the beach area existing approximately 50' inland from the low-water mark on all waterfront parcels (except partially on 1B). As a condition to the continued use and enjoyment of said beach area, the said owners, in accepting their title and this grant of easement, covenant that they will share in the cleaning and maintenance of such beach area in accordance with the provisions contained in the following paragraph relating to the use and enjoyment of the subdivision roads.

5. *Roadway Easement.* All owners of Parcels and all future owners of subdivided plots of said parcels in Peter Farm Subdivision of Peter Bay have a perpetual easement over and upon all subdivision roads built thereon. However, as a condition to the continued use and enjoyment of said roadways, the said owners, in accepting their title and

this grant of easement, covenant that at such time that there shall be a minimum of fifteen subplots sold,[1] and if the owners of said plots by majority action organize a landowners' association for the purpose of taking over title of such roadways, as well as title to the beach access footpath and parking lot connected therewith established for the common benefit of all plots in Estate Peter Farm or otherwise acquired by landowners' association, they will join such association and be bound by its articles and bylaws and such rules and assessments that the association may promulgate for the care, upkeep and maintenance and possible paving or hard-topping said roadways. The limit of any assessment, made by such association of landowners, will be open at all times to judicial review as to the fairness of the individual shares considering the relative size of individual plots and the joint use of said areas by the other owners. Nothing in this paragraph shall be construed to prohibit the landowners of the Parcels of Estate Peter Farm from assigning and transferring title to the roadways to the Virgin Islands Government at any time prior to any action by any landowners' association that may be formed to accept the title of said roadways.

6. *Easements for Utilities.* When subdivision shall be made of the Parcels in Peter Farm, there shall be mutual easements granted to all parcel owners under and/or over narrow strips of land ten feet in width alongside the public and subdivision roads and alongside the southerly and westerly boundaries of each parcel that will be shown on Drawing 1037-3 to provide for the location of utility systems for power, telephone, potable water, sewage and

---

[1] Peter Bay is zoned R-1 (min. ½ acre per plot; max. two dwellings per plot). Deducting areas normally devoted to roads, parkways, beach, etc., the development potential could be from 60 to 80 plots.

drainage. The use of southerly and westerly boundary lines for utility easements will be used only where departure from easements along the roads must be made in order to service remote subplots. In making the final survey drawing, the draftsmen should indicate the location of easements herein described. If there are better locations or objections to these suggestions, the commissioners should resolve same and designate appropriate easement areas.

■ 7. The costs of this partition action will be borne by the parties in accordance with their proportionate shares, i.e., Sammy 1/2 and the others, each 1/6th, except that the unpaid balance of $600.00 of Jack Pearson's 1970 survey costs (originally $1,200.00), be paid: $400.00 by Sammy (who, at that time, had two shares of the estate), and $200.00 by Ethlyn. Lillian, Amiot and Vernon have already paid $200.00 each for their shares.

The costs of this partition include:

| | |
|---|---|
| Kenneth Alexander's fee | $ 500.00 |
| John P. Garfield's fee | 500.00 |
| Nathaniel Wells' fee | 500.00 |
| Virgin Islands Engineering & Survey, Inc., fee (Invoice No. 1430 for $2,490.00 and Invoice No. 1416 for $3,935.00) | 6,425.00 |
| Future surveying costs and commissioners' fee, including any additional fee of Nathaniel Wells for his day testifying in court and checking the computer printouts | |

The court understands that some of the parties have already paid part of their share of the above mentioned fees and costs and others have not. It is the order of this

160

court that any unpaid fee shall be secured by a lien against the properties allocated to the party who is in default and shall not be a lien against any of the properties allocated to the owners who have paid their shares in full.

8. All parties shall bear their own attorney's fees.